UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

YOLEXY RODRIGUEZ BELTRAN,
A# 244-318-042;

        Petitioner,

      v.

        Case No. 2:26-cv-713-KCD-DNF

ATTORNEY GENERAL PAM
BONDI, ATTORNEY GENERAL
OF THE UNITED STATES;
SECRETARY KRISTI NOEM,
SECRETARY, U.S. DEPARTMENT
OF HOMELAND SECURITY
(DHS); ACTING DIRECTOR TODD
M. LYONS, ACTING DIRECTOR,
U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT (ICE);
GARRET J. RIPA, FIELD OFFICE
DIRECTOR, ICE ENFORCEMENT
AND REMOVAL OPERATIONS
(ERO), MIAMI FIELD OFFICE;
WARDEN/FACILITY
ADMINISTRATOR, FLORIDA
SOFT SIDE SOUTH; AND  ALL
OTHER PERSONS HAVING
CUSTODY OF PETITIONER,

        Respondents,

_____/

## ORDER

Petitioner Yolexy Rodriguez Beltran has filed a habeas corpus petition

challenging his detention by U.S. Immigration & Customs Enforcement

("ICE"). (Doc. 1.)[1] He presses three claims. In Counts One and Three, Beltran argues that the Due Process Clause of the Fifth Amendment forbids the government from holding him without an individualized bond hearing or considering less restrictive alternatives to detention. (*Id.* at 5.) Count Two, meanwhile, claims his arrest was unlawful because it occurred without a judicial warrant. (*Id.* at 6.) Because Counts One and Three raise overlapping constitutional challenges to his ongoing custody, the Court addresses them together. But as it turns out, neither theory works. Congress has mandated the detention of arriving aliens like Beltran without the possibility of bond. And the Supreme Court has long recognized that administrative immigration arrests do not require a judge's sign-off. Because the law forecloses each of Beltran's claims, the petition is **DENIED**.

## I. Background

Beltran is a Cuban citizen who arrived at the U.S. border in 2023. After presenting himself to authorities, he was paroled into the country. (Doc. 14-1 at 8.) But that temporary reprieve ended in December 2025. Following his arrest for an alleged domestic battery, Beltran was transferred into ICE custody and served with a Notice to Appear. (*Id.* at 13.) By operation of law, that document instantly terminated his parole. *See* 8 C.F.R. § 212.5(e)(2)(i)

---

[1] The habeas petition is not paginated. For ease of reference, the Court will cite to the page numbers generated by its electronic filing system for all docket entries and exhibits.

("When a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified.").[2] Beltran has remained in federal detention ever since, waiting on a final order of removal.

## II. Legal Framework

The federal habeas statute, 28 U.S.C. § 2241, provides authority to issue writs of habeas corpus when an individual is "[i]n custody in violation of the Constitution or law or treaties of the United States." *Id.* § 2241(c)(3). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). "Section 2241 authorizes federal courts to hear challenges to immigration detention." *Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 2604573, at *2 (S.D. Fla. Sept. 9, 2025).

## III. Discussion

We start with the Due Process Clause. Beltran's core grievance (spread across Counts One and Three) is that the Fifth Amendment forbids the government from locking him up without giving him a chance to argue for bail

---

[2] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

or supervised release. (Doc. 1 at 5-6.) It is a familiar argument, but it runs headlong into a brick wall of Supreme Court precedent.

The Fifth Amendment requires the government to provide due process before depriving a person of life, liberty, or property. *Dep't of State v. Munoz*, 602 U.S. 899, 909-10 (2024). It is "well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 305 (1993); *Zadvydas v. Davis*, 533 U.S. 678, 693-94 (2001) ("[T]his Court has held that the Due Process Clause protects an alien subject to a final order of deportation.").

At the same time, the Supreme Court has repeatedly acknowledged that "the nature of protection [under the Due Process clause] may vary depending upon [immigration] status and circumstance." *Zadvydas*, 533 U.S. at 694; *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application . . . . [H]owever, once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly.").

For noncitizens who arrive at the border without lawful status—even if they manage to physically enter the country—the Due Process Clause is constrained. The Supreme Court's decision in *Dep't of Homeland Sec. v. Thuraissigiam* shows exactly how this works. 591 U.S. 103 (2020). The

4

petitioner in that case tried to cross the border illegally and was apprehended a mere 25 yards into the United States. The government placed him in expedited removal proceedings under § 1225(b)(1) and kept him in continuous custody. *Id.* at 114. When his asylum claim failed, he turned to federal court. He filed a habeas petition asking for a do-over—a court order directing the government to give him another opportunity to apply for asylum relief. *Id.* at 115.

The Supreme Court said no, holding (among other things) that the Due Process Clause did not guarantee the petitioner judicial review of his asylum denial. *Id.* at 139. The Court explained that granting procedural due process rights to arriving aliens beyond what Congress had prescribed "is contrary to more than a century of precedent." *Id.* at 138. That precedent establishes a stark but unyielding rule: for foreigners who have never been admitted into the country, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are* due process of law." *Id.* (emphasis added). This approach stems from a simple constitutional reality—the political branches hold plenary authority over our borders. And if you have the sovereign power to keep someone out, you necessarily possess the power to set the procedural ground rules for making that determination. *Id.* at 139.

The takeaway from *Thuraissigiam* is plain: an arriving alien "has only those rights regarding admission that Congress has provided by statute." *Id.*

5

at 140; *see also Mendoza-Linares v. Garland*, 51 F.4th 1146, 1167 (9th Cir. 2022) (explaining that any rights "an alien seeking initial admission to the United States" may have "in regard to removal or admission are purely statutory in nature and are not derived from, or protected by, the Constitution's Due Process Clause").

An alien "who arrives in the United States (whether or not at a designated port of entry[)] shall be deemed . . . an applicant for admission." 8 U.S.C. § 1225(a)(1). Applicants for admission must be detained pending removal proceedings. *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018). The Government has only one alternative under this framework—it can temporarily release the noncitizen on parole. *Id.* at 288. But make no mistake, this is not a lawful entry. A paroled noncitizen has not been admitted to the country. Instead, the law treats them as if they never crossed the threshold. When the parole ends, they return to custody and are treated "in the same manner as that of any other applicant for admission." *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)). So, while Beltran may have physically spent time in the interior of the United States after his release at the border, the law places him exactly where he started—at the border, subject to § 1225. *See Campbell v. Almodovar*, No. 1:25-CV-09509 (JLR), 2025 WL 3538351, at *6 (S.D.N.Y. Dec. 10, 2025). In other words, aliens "who arrive at ports of entry" and are released into the United States pending removal "are treated for due process purposes as if

6

stopped at the border." *Thuraissigiam*, 591 U.S. at 139; *see also Heng Meng Lin v. Ashcroft*, 247 F. Supp. 2d 679, 683 (E.D. Pa. 2003) ("An excludable alien may be physically allowed into the country while his admission is being considered, but under the entry fiction is still considered to be at the border awaiting entry.").

What that means for Beltran is simple: legally, he never crossed the threshold. He remains an applicant at the border, entitled to claim "only those rights regarding admission that Congress has provided by statute." *Jandres-Ordonez v. Bondi*, No. 6:25-CV-084-H, 2026 WL 274493, at *12 (N.D. Tex. Jan. 23, 2026); *see also Liang v. Almodovar*, No. 1:25-CV-09322-MKV, 2025 WL 3641512, at *5 (S.D.N.Y. Dec. 15, 2025); *Ayala v. Harper*, No. 1:26-CV-204-CLM-GMB, 2026 WL 501113, at *10 (N.D. Ala. Feb. 23, 2026).

Section 1225 provides the procedural boundaries Congress set for arriving aliens like Beltran. "[A]liens falling within the scope of § 1225(b)(2) shall be detained for a [removal] proceeding." *Jennings*, 583 U.S. at 297. The statute "mandate[s] detention of applicants for admission until certain proceedings have concluded" and says nothing "whatsoever about bond hearings." *Id.* Since Congress drew the blueprint for arriving aliens, choosing mandatory detention, Beltran cannot invoke the Fifth Amendment to demand a bond hearing or any other release. For an applicant legally standing at the nation's door, the statutory text provides the beginning and the end of the

7

constitutional inquiry. That means Beltran's due process challenge necessarily fails. *See Arana v. Arteta*, No. 1:26-CV-240-GHW, 2026 WL 279786, at *5-6 (S.D.N.Y. Feb. 3, 2026).

The Supreme Court has recognized that immigration detention can become unlawful under the Due Process Clause. *See Zadvydas*, 533 U.S. at 679. In *Zadvydas*, the Court held that the government cannot hold an alien indefinitely under 8 U.S.C. § 1231(a)(6)—the statute governing detention after a final order of removal has been entered. To avoid serious constitutional concerns, the Court read an implicit time limit into that statute, requiring release if removal is no longer reasonably foreseeable. *Zadvydas*, 533 U.S. at 689.

But *Zadvydas* provides Beltran no help here for a simple and fundamental reason: he is detained under a completely different statutory scheme. Beltran does not yet have a final order of removal. Instead, because his parole was terminated, he is treated as an applicant for admission detained pending the outcome of his removal proceedings under 8 U.S.C. § 1225(b). *See Diaz Patino v. Villegas*, No. 1:25-CV-276-H, 2026 WL 673166, at *4 (N.D. Tex. Mar. 9, 2026). And the Supreme Court has rejected the attempt to transplant *Zadvydas*'s implicit time limits onto § 1225(b). *Jennings*, 583 U.S. at 296-99; *see also Erbite v. Ripa*, No. 2:26-CV-558-JES-NPM, 2026 WL 776143, at *2 (M.D. Fla. Mar. 19, 2026).

8

The Supreme Court in *Jennings* explained that the two statutes are drafted entirely differently. The post-removal statute at issue in *Zadvydas* states that the government "may" detain certain aliens, a permissive word that left the Court room to impose a reasonable temporal limit. *Jennings*, 583 U.S. at 299-300. But § 1225(b) is unequivocal. It mandates that applicants for admission "shall be detained" until their removal proceedings conclude. *Id.* at 297. As the Court put it, the text of § 1225(b) says nothing "whatsoever about bond hearings" and leaves no interpretive room for a *Zadvydas*-style saving construction. *Id.*; *see also Gueye v. Sessions*, No. 17-62232-CIV, 2018 WL 11447946, at *2 (S.D. Fla. Jan. 24, 2018) ("*Zadvydas* did not analyze detention in the context of expedited removal proceedings.").

To be sure, *Jennings* did not resolve every question in this arena. When the Supreme Court declined to rewrite § 1225 to include an implicit bond hearing, it explicitly left for another day the constitutional fallback: whether prolonged mandatory detention under that statute might independently violate the Due Process Clause. *Id.* at 312. And immediately following *Jennings*, some courts did find that aliens proceeding under § 1225(b) have at least some base level of due process rights against unreasonable detention. *See, e.g.*, *Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1147 (9th Cir. 2020) (upholding a preliminary injunction to a class of §1225(b) detainees because

"plaintiffs were likely to succeed on their claim that they are constitutionally entitled to individualized bond hearings before a neutral decisionmaker").

But the Supreme Court has since firmly closed that door in *Thuraissigiam*. That case shows how the Due Process Clause operates—or, more accurately, how it is constrained—when it comes to individuals, like Beltran, who have not been lawfully admitted.

The interplay between the two decisions is straightforward. *Jennings* hypothesized that, at some point, prolonged detention might offend due process. But *Thuraissigiam* clarified exactly what process is "due" to an arriving alien. As mentioned, the Court reaffirmed its "century-old rule" that "Congress is entitled to set the conditions for an alien's lawful entry into this country and that, as a result, an alien at the threshold of initial entry cannot claim any greater rights under the Due Process Clause." *Thuraissigiam*, 591 U.S. at 107, 139.

That rule resolves the constitutional question here. Because Beltran's temporary parole was terminated, the law treats him as though he is still standing at the border, knocking on the door. *Id.* at 139 ("[A]liens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border."). For individuals in this posture, the Due Process Clause is not a roving mandate for federal judges to construct a balancing test. Instead, an

10

arriving alien's constitutional rights are coextensive with his statutory rights. And because Congress unequivocally mandated detention for arriving aliens in § 1225 without providing for a bond hearing, the Due Process Clause does not step in to supply one. In this specific context, the statutory floor is also the constitutional ceiling. *See, e.g.*, *A.E. v. Powell*, No. 7:26-CV-337-EGL-NAD, 2026 WL 782294, at \*7 (N.D. Ala. Mar. 19, 2026); *de la Rosa Espinoza v. Guadian*, No. 20-3126-JWL, 2020 WL 3452967, at \*6 (D. Kan. June 24, 2020).

One can certainly understand Beltran's frustration with his current position, waiting in a detention cell for months while his immigration case inches forward. Yet this Court cannot use judicial fiat to conjure a due process claim just to ease the wait. We are not staring down the barrel of indefinite detention—the constitutional danger the Supreme Court found so problematic in *Zadvydas*. Beltran's current custody has a clear statutory endpoint: it lasts only "until removal proceedings have concluded." *Jennings*, 583 U.S. at 299. And if he eventually receives a final order of removal only to have his deportation stall, the doors of the courthouse will open for him to seek relief under *Zadvydas*. Because the existing framework comes with a built-in expiration date, there is no reason to engineer a constitutional workaround. That leaves Beltran's due process claims without a legal leg to stand on.

Turning to Beltran's final claim, he contends that his detention was constitutionally defective from the jump because ICE officers took him into

11

custody without a judicial warrant. (Doc. 1 at 5-6.) He is simply wrong. Removal proceedings are civil, not criminal. And because they are civil in nature, the "arrest of deportable aliens by order of an executive official"— rather than a neutral magistrate—does not offend the Constitution. *Abel v. United States*, 362 U.S. 217, 230 (1960). In the immigration context, an administrative warrant, will do just fine. *See Landaverde Ardon v. Mina*, No. 6:26-CV-313-JSS-LHP, 2026 WL 530199, at *3 (M.D. Fla. Feb. 26, 2026).

### IV. Conclusion

A federal court's role in a habeas proceeding is to ensure that the government is playing by the rules. Here, it is. Congress wrote a strict set of rules for noncitizens arriving at our borders, mandating their detention and authorizing their administrative arrest. However frustrating Beltran may find the wait, his ongoing custody violates neither the Immigration and Nationality Act nor the Constitution. Because the law forecloses the relief he seeks, the habeas petition (Doc. 1) is **DENIED**. The Clerk is directed to enter judgment, terminate any pending motions, and close this case.

**ORDERED** in Fort Myers, Florida on April 2, 2026.

Kyle C. Dudek
United States District Judge